**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXANDRA POPOVCHAK and OSCAR GONZALEZ, individually and on behalf of all others similarly situated, <br><br>                        Plaintiffs, <br><br>     v. <br><br> UNITEDHEALTH GROUP INCORPORATED, UNITED HEALTHCARE INSURANCE COMPANY, UNITED HEALTHCARE SERVICES, INC., and UNITEDHEALTHCARE SERVICE LLC, <br><br>                     Defendants. | Civil Action No. 1:22-cv-10756-VEC <br><br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Alexandra Popovchak, Oscar Gonzalez, and Melanie Webb (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring the following complaint against Defendants UnitedHealth Group Incorporated, United HealthCare Insurance Company, United HealthCare Services, Inc., and UnitedHealthcare Service LLC (collectively, "Defendants" or "United"), as follows:

<u>**INTRODUCTION**</u>

1.      In this action, Plaintiffs challenge a self-serving scheme devised by United to fuel its own profits at the expense of the members (i.e., the participants and beneficiaries) of the employer-sponsored health benefit plans United administers.

2.      The scheme starts with a violation of the plans' written terms. Whereas the plans' written terms require United to determine the amount of benefits due for covered services from out-of-network providers based on "competitive fees" in the provider's geographic area, United deliberately ignores the readily-available data on such fees and instead bases its determinations on

data supplied by vendors called "Repricers," which is based on the deeply discounted rates insurance companies have paid for the services.

3.      Using the deeply discounted rates supplied by the Repricers, United deems just a fraction of the out-of-network provider's billed charge as eligible for reimbursement under the plan. But United does not—and cannot—force the out-of-network providers to accept the discounted rate as full payment. As a result, the plan member (i.e., the patient) remains financially and legally liable for the unpaid portion of the provider's bill.

4.      Nevertheless, United collects from the plan a "savings fee" calculated as a percentage of the phantom "savings" United "obtained" for the plan member—that is, United takes for itself as much as one-third of the difference between the provider's billed charge and the discounted rate United determined to be "eligible" for payment under the plan. The lower United can push the eligible expense, the greater this difference, and the greater United's "savings" fee— even though the "savings" never exist at all for the plan member.

5.      United and its Repricers have raked in billions from this scheme. In doing so, however, United has violated the terms of the Plaintiffs' plans and breached the fiduciary duties it owes to the Plaintiffs and to their plans, all in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").

## THE PARTIES

6.      Plaintiff Alexandra Popovchak ("Ms. Popovchak") is a resident of Manalapan, New Jersey. She is a beneficiary of a self-funded health benefit plan, the Morgan Stanley Health Benefits and Insurance Plan (the "Morgan Stanley Plan"), sponsored by her father's employer, Morgan Stanley. The Morgan Stanley Plan is governed by ERISA. The written terms of the Morgan Stanley Plan are set forth in the plan's Summary Plan Description ("SPD").

7.     Plaintiff Oscar Gonzalez ("Mr. Gonzalez") is a resident of Newark, New Jersey. He is a beneficiary of a self-funded health benefit plan, the Fresenius Medical Care Premium Medical Plan (the "Fresenius Plan"), sponsored by his wife's employer, Fresenius Medical Care ("Fresenius"). The Fresenius Plan is governed by ERISA. The written terms of the Fresenius Plan are set forth in that plan's SPD.

8.     Plaintiff Melanie Webb ("Ms. Webb") is a resident of New Castle, Delaware. She is a participant in the Fresenius Plan.

9.     Defendant **UnitedHealth Group Incorporated ("UHG")** is a publicly-held corporation with its principal place of business in Minnetonka, Minnesota. UHG is a diversified health care company, which operates nationwide through its direct and indirect wholly-owned and controlled subsidiaries, including Defendants United HealthCare Insurance Company, United HealthCare Services, Inc., and UnitedHealthcare Service LLC.

10.    UHG's two primary complementary businesses operate under the trade names "Optum" and "UnitedHealthcare." Optum is an information and technology-enabled health services business that, among other things, markets and sells FAIR Health Charge Data (discussed below) to healthcare providers. UnitedHealthcare offers a full spectrum of health benefit programs, including as an issuer and administrator of health benefit plans governed by ERISA. UnitedHealthcare plans provide healthcare coverage to 26.2 million people in all fifty states and the District of Columbia.

11.    Defendant **United HealthCare Services, Inc. ("UHS Inc.")**, a Minnesota corporation, is a wholly owned and controlled subsidiary of Defendant UHG.

12.    Defendant **United HealthCare Insurance Company ("UHIC")**, a Connecticut corporation, is a wholly owned and controlled subsidiary of UHS Inc.

13.     Defendant **UnitedHealthcare Service LLC ("UHS LLC")**, a Delaware limited liability company, is a wholly owned and controlled subsidiary of UHIC.

14.     Defendants, other than UHG, do not operate independently and in their own interests, but serve solely to fulfill the purposes, goals, and policies of Defendant UHG.

15.     Defendants are referred to collectively in this Complaint as "United."

## JURISDICTION AND VENUE

16.     Subject-matter jurisdiction is appropriate over Plaintiff's claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

17.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (c)(2). United issues and administers various ERISA health benefit plans in this District, including the Morgan Stanley Plan, and makes coverage and benefits decisions for insureds who work or reside in this District.

18.     The Morgan Stanley Plan's SPD specifies that "an action in connection with the plan (plans), including, but not limited to, any claims brought under ERISA for benefits or to enforce fiduciary duties, must be filed in the United States District Court for the Southern District of New York located in the City and State of New York."

19.     Further, all Defendants, either directly or through wholly owned and controlled subsidiaries, conduct business here.

## FACTUAL ALLEGATIONS

I.     **Background**

    A.     **United's Role as Claims Administrator for Plaintiffs' Self-Funded Plans**

20.     United administers health benefit plans for millions of Americans, including group health plans that are sponsored by private employers and therefore governed by ERISA.

21.     Under ERISA, each plan that United administers is a separate entity, akin to a trust, which is established for the exclusive purpose of providing healthcare benefits to the participants and beneficiaries of that plan. As the Claims Administrator for an ERISA health plan, United makes coverage and benefit determinations pursuant to the plan's written terms and uses plan assets to pay benefits for covered healthcare expenses and to defray the plan's reasonable administrative expenses.

22.     About two-thirds of the ERISA plans United administers are "self-funded" plans. A self-funded plan's assets are comprised of contributions from the plan sponsor and payroll contributions from participating employees. Each self-funded plan pays United an administrative services fee, calculated as a set amount per member, per month, for its services as Claims Administrator for the plan.

**B.      Defendants are Fiduciaries with Respect to the Plaintiffs' Plans and the Benefit Determinations at Issue in This Case**

23.     UHG, acting through its subsidiaries, and using the trade name "UnitedHealthcare," is the Claims Administrator for each of the Plaintiffs' plans.

24.     UHG and its subsidiaries deliberately obscure which subsidiary or subsidiaries are responsible for taking which actions with respect to the administration of particular plans and claims. On information and belief, United does this to enable each United entity to argue—as Defendants did in response to Plaintiffs' original complaint in this action—that the plan member's allegations are insufficient to demonstrate which entity owed fiduciary duties and/or took the actions subject to the complaint.

25.     For example, the Plaintiffs' SPDs identify the Claims Administrator solely as "UnitedHealthcare," using UHG's trade name, rather than specifying which United entity or entities have the authority to administer plan benefits.

26.     The Plaintiffs' plans, moreover, delegate to "UnitedHealthcare"—not to any specific United entity—"the discretion and authority to decide whether a treatment or supply is a Covered Service and how the Eligible Expenses will be determined and otherwise covered under the Plan." UHG, acting through its subsidiaries, exercised this discretionary authority when it determined how much of Plaintiffs' healthcare providers' billed charges to deem "eligible" for reimbursement under the Plaintiffs' plans.

27.     UHG, acting through its subsidiaries, exercises complete control over the bank accounts holding the Plaintiffs' plans' assets, unilaterally determines the amount of benefits each plan will pay for services covered under the plan, and issues those benefit payments on the plans' behalf from the bank accounts it controls.

28.     Each of the UHG subsidiaries named as Defendants in this case participated in administering the Plaintiffs' benefits and possessed and exercised discretionary authority with respect to Plaintiffs' benefits claims.

29.     For example, the address the Morgan Stanley SPD provides for Claims Administrator "UnitedHealthcare" is the same as UHIC's business address: 450 Columbus Blvd., Hartford, CT 06103.

30.     UHIC was the entity that pre-authorized Mr. Gonzalez's surgery as medically necessary under the Fresenius Plan.

31.     In correspondence with Plaintiffs, United identified UHS, Inc. and UHS LLC as the "legal entities" that made the benefit determinations on Plaintiffs' claims and that decided their administrative appeals.

32.     As such, each of the Defendants is a fiduciary under ERISA with respect to United's determinations of the Eligible Expenses for Plaintiffs' benefit claims, and all of them, collectively, are co-fiduciaries with respect to those determinations.

33.     As ERISA fiduciaries, Defendants are required to make benefit determinations consistent with the terms and conditions of the underlying benefit plan, so long as doing so does not otherwise violate ERISA. *See* 29 U.S.C. § 1104(a)(1)(D). Among other things, this means that Defendants must interpret written plan provisions according to their plain meaning, interpret written plan terms that are ambiguous in a reasonable manner, and interpret the same plan terms consistently from claim to claim.

34.     ERISA also imposes a strict fiduciary duty of loyalty on administrators like Defendants, requiring them to discharge their duties with respect to a plan ***solely*** in the interests of the plan's participants and beneficiaries, and for the ***exclusive*** purpose of providing benefits to plan members and defraying reasonable expenses of plan administration. ERISA fiduciaries must scrupulously avoid all self-interest, duplicity, and deceit; must fully disclose to, and inform plan members of, all material information; and may not make misrepresentations to plans or plan members.

35.     As alleged herein, United has violated all of these fiduciary duties.

## II.     Plaintiffs' Plans Promise to Pay Benefits for Covered Healthcare Services from Out-of-Network Providers at Rates that are Based on "Competitive Fees"

36.     United contracts with various healthcare providers who participate in United's "network" (i.e., in-network, or "INET" providers). In-network providers agree to accept reimbursement rates set by United for the covered healthcare services they provide, and promise in advance not to bill patients covered by United plans for more than those agreed-upon rates.

37.     Like most of the ERISA plans United administers, Plaintiffs' plans also cover healthcare services received from providers who do not participate in United's network—i.e., out-of-network ("ONET") providers. ONET providers do not have any ongoing contractual relationship with United, and have not agreed in advance to accept any specific reimbursement rates for their services. Instead, ONET providers bill their patients their usual and customary rates for the services provided, and United then determines how much of that billed charge is covered under the plan terms and in accordance with applicable law.

38.     Under the terms of the Plaintiffs' plans, the amount of benefits the plan will pay for a covered healthcare service is based on the "Eligible Expenses" for that service. Specifically, the plans promise to pay an enumerated percentage of the Eligible Expenses for each Covered Health Service listed in the plan. For example, the Plaintiffs' plans' SPDs provide that, after the member has satisfied their annual deductible, the plan will pay 80% of Eligible Expenses for professional services provided by INET surgeons and 60% of Eligible Expenses for professional services provided by ONET surgeons.

39.     The Plaintiffs' SPDs, moreover, expressly delegate to "UnitedHealthcare" the discretion and authority to determine Eligible Expenses consistent with the plan terms and applicable law. When United exercised that discretion, it was acting as a fiduciary under ERISA.

40.     The written plan terms set forth *how* United was to determine Eligible Expenses. The Plaintiffs' plans specify that, in the absence of a negotiated agreement between United and the ONET provider, the Eligible Expenses for ONET services will be "determined based on available data resources of competitive fees in [the] geographic area" in which the service is provided. This Complaint will refer to this plan term as the "**Competitive Fee Term**" and to the

United plans that include this provision—including the Plaintiffs' plans—as "**Competitive Fee Plans**."

41.     The plans further state that, for OON services received on an emergency basis, in the absence of a negotiated agreement between United and the ONET provider, the Eligible Expenses are "an amount. . . permitted by law." When Plaintiff Popovchak received her emergency appendectomy, applicable federal law required United to use "the same method" to set Eligible Expenses as it "generally uses to determine payments for out-of-network services" under her plan—that is, "based on available data resources of competitive fees in [the provider's] geographic area."

42.     The Plaintiffs' plans further provide that, if "data resources of competitive fees in a geographic area are not available," United will set Eligible Expenses using "a gap methodology established by *OptumInsight* and/or a third party vendor that uses a relative value scale or similar methodology." The plan terms do not permit United to use a "gap methodology" or "relative value scale" methodology to set Eligible Expenses if there are "available data resources" of competitive fees.

43.     Under the Plaintiffs' plans, the amount of any ONET provider's bill that exceeds the Eligible Expenses determined by United is considered "not covered" by the plan (even if the healthcare service itself is otherwise covered).

44.     The plan terms further explain that the plan member is responsible for paying the amount an ONET provider bills in excess of the Eligible Expense, stating:

> You will be responsible for any amount billed by the out-of-network provider that is greater than the amount [United] determines to be an Eligible Expense as described below. For out-of-network benefits, you are responsible for paying, directly to the out-of-network provider, any difference between the amount the provider bills and the amount [United] pays for Eligible Expenses. . . .

**IMPORTANT NOTICE**: Out-of-network providers may bill you for any difference between the provider's billed charges and the Eligible Expense described here.

### III.   The Competitive Fee Term Requires United to Determine ONET Reimbursement Rates Using Providers' Actual Billed Charges

45.     As alleged above, the Plaintiffs' plans delegate to United the discretion to determine "Eligible Expenses" for ONET services "based on available data resources of competitive fees" in the provider's "geographic area." In other words, the plans require United to review data on providers' fees—the actual amounts billed by providers in the same geographic area for the same service—and to set the Eligible Expense at a "competitive" level in relation to those actual fees.

46.     As explained further below, United is well aware of, and already regularly uses, at least one reliable public database containing extensive, objective information on providers' actual billed charges: FAIR Health Charge Data.

### A.   FAIR Health Charge Data Reflects Providers' Actual Fees for Healthcare Services by Geographic Region

47.     FAIR Health is an independent nonprofit that collects data for and manages the nation's largest database of privately billed health insurance claims.

48.     FAIR Health was established following an investigation by the New York Attorney General ("NYAG") into, among other things, United's alleged misuse of its own proprietary database, called "Ingenix," to set unreasonably low provider reimbursement rates. That investigation resulted in settlement agreements between NYAG and United, as well as other insurers, which provided for the establishment of FAIR Health in 2009.

49.     As FAIR Health's website explains,

FAIR Health was formed as an independent organization to bring transparency, integrity, reliability and accessibility to healthcare costs and insurance information for all healthcare stakeholders. Our mandate was to provide an independent

database of claims information contributed by payors nationwide, a free website to educate consumers about the cost of care in their geographic areas and insurance reimbursement, and data for research that could help to formulate or evaluate policy and support academic studies.

https://www.fairhealthconsumer.org/#about.

50.     FAIR Health collects data from insurance companies, health care plans, and healthcare providers from around the country and makes the information available in a public database. The database includes more than 38 billion private health care claim records for more than 10,000 healthcare services provided throughout the United States since 2002, and is updated with about 2 billion new records each year.

51.     FAIR Health, moreover, organizes its vast repository of data on healthcare providers' billed charges (hereafter, "FAIR Health Charge Data") by both procedure code and geographic area, and breaks that data down further into percentiles by amount.

52.     FAIR Health Charge Data thus provides a reliable source that accurately reflects what healthcare providers bill for their services in the open market, even if it may not be the only such resource.

53.     As United itself frequently acknowledges in correspondence with healthcare providers:

Fair Health, Inc., is an independent non-profit organization established in October 2009. Its name is derived from the term *fair and independent research*. FH Benchmark [a benchmarking database created by FAIR Health, Inc.] is a comprehensive source of information because it collects data based on a large volume of actual, non-discounted charges that providers have submitted to contributing payers in the previous 12 to 18 months in various geographic areas for services rendered by health care providers. (Original emphasis).

54.     Thus, United admits that the FAIR Health database is a reliable source of accurate information on providers' actual, non-discounted fees.

55. Indeed, United even sells FAIR Health Charge Data to healthcare providers to use as a basis for setting their own fees. Using its trade name, "Optum," United has, for years, been selling a product to healthcare providers called the "Customized Fee Analyzer." On its website, United describes this product as follows:

> Customized Fee Analyzer provides physicians with percentiles of physician charge data for their geographic area by Geozip and the CPT® codes most frequently used in their specialty. Underpriced fees can cost a practice thousands of dollars each year. To set the most appropriate fees, you need specific information for your geographic locality, as fees vary widely across the country. Relying on national averages can result in reimbursement that is too low or billed charges that are too high. This resource provides defensible data when revising your fee schedules and negotiating contracts.

https://www.optumcoding.com/product/61272/.

56. United's Customized Fee Analyzer is based on FAIR Health Charge Data. In its sales pitch for this tool, United warns providers that failing to take advantage of this data could "cost a practice thousands of dollars each year" by causing the provider to use "underpriced fees," and that "relying on national averages," rather than specific information for the provider's geographic location, could result in underpayments. Moreover, United explicitly touts its product as providing "defensible data" with regard to ONET provider charges.

57. Despite knowing that FAIR Health Charge Data offers readily-available, accurate, and defensible data on provider fees by geographic region, United has increasingly turned instead to so-called "Repricers" to set ONET reimbursement rates, as alleged below.

**B. Third-Party "Repricers," Like Data iSight, Do Not Identify "Competitive Fees" and Instead Set Reimbursement Rates Well Below What Providers Actually Charge**

58. Unlike FAIR Health, which was created to promote transparency and fairness in the healthcare system, "Repricers" are for-profit companies that use proprietary methodologies to help payors "reprice non-contracted charges"—that is, to select a new, lower amount to recognize

as "eligible" for coverage, instead of an ONET provider's actual billed charge or a competitive rate in the provider's geographic region.

59.     Repricers, by definition, do not seek to mirror what providers actually charge for their services in the competitive market—their whole purpose is to justify steep discounts from providers' actual fees.

60.     One such Repricer, Data iSight, has explained its methodology as follows in correspondence to healthcare providers:

> **Methodology.** The Data iSight reimbursement determination is calculated using paid claims data from millions of claims from many different payers and patients with a distribution of age, gender and location that reflects the U.S. Census.
>
> The Data iSight reimbursement calculation is based upon standard relative value units where applicable for each CPT/HCPCS code multiplied by a conversion factor. The conversion factor is based on the median accepted reimbursement amount by physicians/healthcare providers nationwide for each code.

61.     Whereas FAIR Health is an accurate database of real provider fees, the Data iSight repricing service is a "relative value scale" methodology based on "paid claims data" from insurance companies. The methodology used by Data iSight, and other third-party Repricers, is thus not even designed to reflect "competitive fees," and Plaintiffs' plans do not permit United to use that methodology when data on providers' actual fees is available.

62.     The Repricers' methodology, moreover, is designed to reduce reimbursement amounts. Paid claims data reflects what insurers and claims administrators have reimbursed for a service, *after* imposing or negotiating deep discounts. Using Repricer data, therefore, necessarily leads to much lower "Eligible Expense" amounts than using FAIR Health Charge Data or another "available data resource" that reflects what providers actually charge in a competitive market.

63.     As a result, using rates recommended by Data iSight and other third-party Repricers to determine "Eligible Expense" results in much lower benefit payments being made to or on

behalf of plan members than what the plan promises. This is exactly what happened in the Plaintiffs' cases, as alleged further below.

### C.    United's Inconsistent Interpretations of the Plans it Administers

64.    The federal regulations governing ERISA require that a plan's claims procedures:

> contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

29 CFR 2560.503-1(b)(5). United, as the Claims Administrator for the Plaintiffs' plans, violated this requirement and issued arbitrary claims determinations because it inconsistently interpreted the Competitive Fee Term.

65.    As alleged above, the Competitive Fee Plans state that, when an ONET provider does not contract with United to accept an agreed reimbursement amount, United will determine the Eligible Expenses for ONET services "based on available data resources of competitive fees in [the] geographic area" in which the service is provided.

66.    In some instances, United reasonably interprets this plan language as calling for United to use FAIR Health Charge Data. Not only is use of this data consistent with the plans' written terms, it is also in the best interests of the plan members, because using charge-based data allows for coverage of a much higher proportion of the real expense for a covered service than the Repricer methodologies, which are based on the discounted pittances insurance companies have been willing to pay.

67.    In many other instances, however, United arbitrarily ignores the *same* Competitive Fee Term and bases its determinations on data from Repricers like Data iSight. This interpretation unreasonably equates Repricers' "relative value scale" method using discounted insurance-

reimbursement rate data (that is, data that builds in *discounts* on competitive provider fees) with the "competitive fee" data the plans require United to use.

68.　　In one particularly egregious example, in 2021, a member of a Competitive Fee Plan received health care services from an ONET provider, who submitted a claim for benefits and properly listed seven different Current Procedure Terminology ("CPT") codes for the procedures performed. After United issued its benefits determination, the provider appealed the amount of benefits United had authorized. In denying the appeal, United confirmed it had used FAIR Health Charge Data to determine the Eligible Expense for *four* of the CPT codes, but admitted that it relied on Data iSight for the remaining three CPT codes.

69.　　In its letter addressing the first four codes, United explained,

> In determining Reasonable and Customary (R&C) amounts under your plan, UnitedHealthcare used FH Benchmarks, a benchmarking database created by FAIR Health, Inc. Fair Health, Inc., is an independent non-profit organization established in October 2009. Its name is derived from the term *fair and independent research*. FH Benchmark is a comprehensive source of information because it collects data based on a large volume of **actual, non-discounted charges** that providers have submitted to contributing payers in the previous 12 to 18 months in various geographic areas for services rendered by health care providers. . . .

> During adjudication of out-of-network claims, **our system refers to the FH Benchmarks database and automatically applies the amount reported at the plan's selected percentile** for your geographic area (called the geo zip) for eligible claims. Your plan has chosen to use the 80th percentile (emphasis added).

70.　　By contrast, United's letter denying the appeal as to the other three CPT codes stated:

> This claim has been reimbursed using Data iSight, which utilizes cost data if available (facilities) or **paid data (professionals).** . . .

71.　　Thus, by its own admission, United interpreted the Competitive Fee Plan language to have two different, mutually-exclusive meanings—both "actual, non-discounted charges" and "paid" charges, which *are* discounted—with respect to the ***same claim***.

72.     In another example, in 2022, United used the same inconsistent plan interpretation when adjudicating two separate claims submitted by an ONET provider under the same Competitive Fee Plan: for one claim, United determined that FAIR Health Charge Data was the proper source of competitive fee information, and for the other, United relied on Data iSight (albeit without claiming that Data iSight was the appropriate source to use).

73.     Tellingly, in both of those cases, United represented that its systems' default when adjudicating ONET claims is to "refer[] to the FH Benchmark database and automatically appl[y] the amount reported at the plan's selected percentile for [the member's] geographic area. . . ." The fact that United makes FAIR Health Charge Data its default source for competitive fee information for ONET claims shows that United knows the only reasonable interpretation of the Competitive Fee Term is that it requires United to use "actual, non-discounted charges" as the basis for Eligible Expenses.

74.     United's admission further shows, moreover, that United actively *chose* to deviate from its default (and from the plans' written terms) whenever it used Data iSight or another vendor to "reprice" a claim—or, as in the example above, part of a claim. United's reason for doing so is no mystery: using Repricer data to set ONET reimbursement rates directly serves United's financial self-interest (at the expense of plan participants and beneficiaries), as further alleged in the next section.

## IV.   United's Self-Serving "Savings Fee" Scheme

75.     For many years, all United earned for its claims-administration services to self-funded plans were its per member, per month administrative services fees. More recently, however, United realized that it could bring in substantially more revenue by charging self-funded plans an additional "savings fee" each time it secured a "discount" on an ONET provider's billed charges—

and that it could generate even more such fees if United unilaterally imposed the discounted rates on providers.

76.     Starting in about 2016, United began to encourage its self-funded plan clients to move to its "shared savings initiative," which featured these "savings fees." United persuaded plans to sign up for its so-called "Shared Savings Program" by representing that United would not only secure for the plans (real) discounts on ONET provider fees, but that it would also relieve the plan *members* of financial liability for the full amount of the provider's billed charge. In other words, a key premise underlying the "savings" part of United's "Shared Savings Program" is that, absent an ONET provider's agreement to accept a discounted amount, the plan terms make the plan member financially responsible for unpaid portions of the provider's bill—and that providers *do* regularly "balance-bill" patients for those unpaid amounts.

77.     The Morgan Stanley Plan's SPD, for example, describes the so-called "Shared Savings Program," in relevant part, as follows:

> A program through UHC may obtain a discount to an out-of-network provider's billed charges. This discount is usually based on a schedule previously agreed to by the out-of-network provider. When this happens, you may experience lower out-of-pocket amounts.

78.     In truth, however, Plaintiffs' providers did not participate in any such Shared Savings Program and did not previously agree to any discounted fee schedule. Instead, United was lining its own pockets at the plans' and plan members' expense by abusing its discretion and claiming illusory "discounts" for which it nevertheless collected "savings fees."

79.     Under the "Shared Savings Program," United calculates the "savings fee" it charges to self-insured plans as a percentage—often as high as 35%—of the difference between the provider's full billed charge and the Eligible Expense determined by United. Thus, the greater the

difference between the provider's actual billed charge and the Eligible Expense, the more money United "earns" through its savings fees.

80.    United quickly realized that, by using Repricer methodologies to set Eligible Expenses, rather than basing its determinations on available data resources of competitive fees, like FAIR Health Charge Data, United is able to collect substantially more money in "savings fees." This is because the rate recommended by the Repricer is usually a fraction of the fees actually charged by providers, generating a greater delta on which to calculate the savings fee percentage.

81.    United, in turn, compensates the Repricer for acting as United's shill by passing on to the Repricer a percentage of the savings fee it collects from the plan. Again, the larger the difference between the provider's actual billed charge and the Repricer's recommendation, the larger the kickback to the Repricer.

82.    For many claims, the amount of "savings fees" the plans pay to United exceeds the amount of benefits the plans pay (on the patient's behalf) to the provider, who actually provided the covered medical services that led to the benefit claim in the first place.

83.    United, moreover, actively encourages providers to set their billed charges using FAIR Health Charge Data sold by Optum, then sets Eligible Expenses at the much lower rates recommended by the Repricers, ensuring large deltas on which to base its "savings" fees.

84.    Among the various problems inherent in United's scheme is the fact that it applies even when ONET providers never agreed to participate in it. Plaintiffs' ONET surgeons do not participate in the "Shared Savings Program" and did not agree—either in advance or after the fact—to accept as full payment the tiny fraction of their billed charge that United's Repricers offered them. Nor did they agree to refrain from balance-billing the Plaintiffs for the unpaid

balance of the billed charges. As a result, the Plaintiffs are left footing almost the entire bill for services that United determined are otherwise covered by their plans.

85.     While rewarding itself for ginning up "savings" by using Repricers to depress Eligible Expenses, United also makes misrepresentations to plan members, by falsely stating that the member is not financially responsible for the unpaid amount of the provider's bill and falsely representing that the provider agreed to accept a discounted rate. United does so even though the ONET provider has never agreed to accept as full payment the amount offered by the Repricer and deemed "eligible" by United, and even though the written plan terms expressly make the patient responsible for billed charges that are not considered Eligible Expenses under the plan.

86.     Since United started using Data iSight to set ONET rates instead of FAIR Health Charge Data or some other available data resource of providers' actual charges, it has collected billions of dollars in "savings fees," more than a billion of which United has passed on to Data iSight. But United's unearned payday came at the expense of the participants and beneficiaries of the plans, as well as the plans themselves.

87.     When it determined ONET benefits using rates recommended by Repricers in violation of the plans' Competitive Fee Term, United set the Eligible Expenses for the covered services substantially lower than if it had used available data resources of providers' competitive fees, as the plans require. As a result, United caused the plans to pay far less in benefits for the services than the plan terms contemplate. Not only did United underpay the benefits due, it also left the plan members with far greater financial and legal liability to their ONET providers for the unpaid portions of the bills than if United had determined benefits in accordance with the plan terms. At the same time, because United only recognized "Eligible Expenses" when considering how much of the plan members' out-of-pocket payments would count toward their deductibles and

out-of-pocket maximums, United made those cost-sharing obligations harder to satisfy even when the member paid substantial amounts out-of-pocket for *otherwise covered* medical care. All of these results of United's scheme directly injured the affected plan members, including Plaintiffs.

88.     United also injured the plans by misdirecting plan assets to its own coffers (and to the Repricers) by pocketing them as a "savings fee" rather than using them to pay benefits to the plan participants and beneficiaries or to defray reasonable expenses of plan administration. The savings fees to United and the Repricers are not "expenses of administering the plans," and they are inherently unreasonable in any event, since they reflect payment for a service United did not actually provide. United did not secure any real savings for the members or the plans, because the ONET providers did not agree to accept the "repriced" amount.

89.     Evidence of United's practices with regard to ignoring competitive fees and relying instead on Data iSight's methodology for setting ONET rates, as detailed herein, was disclosed in a trial that recently ended in Nevada, *Fremont Emergency Services (Mandavis) Ltd. v. United Healthcare Insurance Company*, No. A-19-792978-B (Clark Cty. Dist. Ct.). In that case, a Nevada-based emergency room ("ER") staffing company sued United for paying unreasonably low amounts to providers who performed ER services. After the United practices were disclosed, primarily through the testimony of United's own witnesses and its own documents, which clearly described significant differences between reimbursement using FAIR Health Charge Data versus Repricers such as Data iSight, a jury awarded the plaintiff more than $2 million in compensatory damages and $60 million in punitive damages, reflecting the jury's conclusion that United had improperly sought to maximize its own profits by underpaying out-of-network ER providers.

90.     United, nevertheless, continues to depress reimbursement rates and boost its "savings fees" by using Repricers rather than basing its benefit determinations on competitive fees as required by the plans.

**V.     United Used Data iSight to Set the Eligible Expenses for Plaintiffs' Healthcare Services at Unreasonably Low Amounts in Violation of the Plaintiffs' Plans**

     **A.     Plaintiff Popovchak**

91.     Ms. Popovchak received an emergency appendectomy on December 29, 2020 from Dr. Emil Shakov of Specialty Physicians of New Jersey ("SPNJ"), an ONET provider with respect to United. Because Ms. Popovchak's surgery was provided on an emergency basis, she did not have the opportunity to choose an in-network surgeon to perform her life-saving surgery.

92.     Dr. Shakov billed $36,569.80 for his professional services as Ms. Popovchak's surgeon, and SPNJ submitted a claim for that amount to United on Ms. Popovchak's behalf.

93.     United determined that the surgery was a covered service under the Morgan Stanley Plan.

94.     On April 9, 2021, UHS LLC issued a Provider Remittance Advice ("PRA") to SPNJ, which reported on how United had determined the claim. Of the total bill, United only allowed $1,031.91 for the emergency appendectomy, of which United paid just $925.32.

95.     Although United reported in the PRA that Ms. Popovchak's "Patient responsibility" was $16,106.59, in fact, under her plan, Ms. Popovchak was responsible for $35,537.89—i.e., the entire difference between the $925.32 United paid for Dr. Shakov's services and the full billed charge.

96.     United did not negotiate a reduced amount with Dr. Shakov or SPNJ, and the provider did not agree to accept only $1,031.91 as full payment for the surgical services Ms. Popovchak received.

97.     Instead, United determined the Eligible Expenses for Dr. Shakov's services based on information provided by Data iSight. In the PRA, United stated:

> Member: This service was provided by an out-of-network provider. We paid the provider according to your benefits and data provided by Data iSight. If you're asked to pay more than the deductible, copay and coinsurance, please call Data iSight at 877-859-2166 or visit DataiSight.com. They will work with the provider on your behalf. If the provider disagrees with Data iSight, the provider might bill you for the difference between the amount billed and the amount allowed. We've asked them not to. Please contact us if they do. Provider: Please don't bill the patient above the amount of deductible, copay and coinsurance.

98.     If United had, instead, based its determination on FAIR Health Charge Data (at the 80th percentile, as in the examples cited above), the Eligible Expense for Ms. Popovchak's surgery would have been $29,884.00, or over 80% of her surgeon's billed charges.

99.     On October 13, 2021, Dr. Shakov, through counsel, timely submitted an administrative appeal on Ms. Popovchak's behalf, challenging how United had determined her claim for benefits. Among other things, the appeal letter objected to United's use of Data iSight as its basis for setting the Eligible Expenses, pointing out that "[t]here is nothing in the member's plan that authorizes reimbursement amounts to out-of-network providers to be determined through this methodology," adding:

> Data iSight is merely a computer database owned by MultiPlan that bases reimbursement on Allowed Amounts by payors and could not consider what the 'typical competitive charges' are in a given location based on its database. Thus, using Data iSight to establish the reimbursement rate for an out-of-network provider violates the terms of the plan. . . . The plan has violated fiduciary duties in administering benefits under the plan. Finally, use of Data iSight to exclusively price this claim is not in accordance with the benefit plan and benefits have not been paid in accordance with the plan.

100.    In the appeal, Dr. Shakov further argued that United should have used FAIR Health Charge Data to determine Ms. Popovchak's claim.

101.    United denied the appeal by letter dated December 4, 2021 and listing UHC, Inc. as the "legal entity" that made the determination. Without quoting plan language (including the Competitive Fee Term) or referencing FAIR Health at all, United upheld its benefit decision, asserting that it had processed the claim according to the plan provisions and therefore, "the determination remains unchanged and is upheld."

102.    United then confirmed that it was continuing to rely on Data iSight to determine the benefit amount, stating:

> This claim was processed correctly to your plan benefits. This claim has been reimbursed using Data iSight, which utilizes cost data if available (facilities) or paid data (professionals). The discount shown is your savings and is not included in the amount you owe. You only need to pay your co-insurance, co-payment and/or deductible listed on your explanation of benefits. If your provider bills you any other amount, please call the toll-free member phone number on your health plan ID card. If your provider has questions about their reimbursement amount, they may visit Data iSight.com or call toll-free at 1-866-835-4022.

103.    This statement not only conflicts with the representation United made in the PRA—that Ms. Popovchak owed $16,106.59—it was false and misleading in any event. Dr. Shakov and SPNJ never agreed to any "discount," meaning that United had secured no "savings" or "discounts" of any kind. United's assertion that such a discount represented a "savings" for Ms. Popovchak and was "not included in the amount [she] owe[d]" was also false. Similarly, the representation to Ms. Popovchak that "[y]ou only need to pay your co-insurance, co-payment and/or deductible listed on your explanation of benefits" was also false, since, under the terms of the Morgan Stanley Plan, she was, and is, responsible for the entire difference between the billed charge and the benefits determined by United. As of the date of this filing, Ms. Popovchak remains responsible for the entire unpaid amount of Dr. Shakov's fee, up to the total billed charge.

104.    Dr. Shakov, through counsel, submitted a second-level administrative appeal on Ms. Popovchak's behalf on March 14, 2022. In the second appeal, Dr. Shakov again explained

why United could not rely on Data iSight data, but was required to use FAIR Health Charge Data instead.

105.    United denied the second-level administrative appeal on March 28, 2022, in a letter identifying UHS LLC as the "legal entity" that made the determination. Once again failing to acknowledge the Competitive Fee Term in the Morgan Stanley SPD, and ignoring FAIR Health entirely, United reiterated its reliance on Data iSight, repeating the identical paragraph about Data iSight it had included in its December 4, 2021 denial letter.

106.    United's March 28, 2022 letter stated, "Please be advised that you have exhausted all levels of internal appeals with UnitedHealthcare. There are no further appeal steps available with us."

107.    None of United's letters to Ms. Popovchak notified her that her plan imposed a truncated six-month limitations period for her to sue for benefits due.

**B.    Plaintiff Gonzalez**

108.    On May 19, 2021, Plaintiff Gonzalez received spinal surgery at Mount Sinai Hospital in New York City from Dr. Sean McCance and Dr. Peter Frelinghuysen, both of whom are ONET providers with respect to United.

109.    UHIC determined that the surgery was a covered service under the Fresenius Plan.

110.    Dr. McCance billed $54,000 for his professional services as Mr. Gonzalez's primary surgeon, while Dr. Frelinghuysen billed $27,500 for his professional services as the assistant surgeon.

111.    On Mr. Gonzalez's behalf, the providers submitted claims to United for benefits under the Fresenius Plan for these expenses.

*The McCance Claim*

112.    In an Explanation of Benefits ("EOB") UHS Inc. issued to Mr. Gonzalez on July 27, 2021, United correctly stated that Dr. McCance billed $54,000 for his services as the primary surgeon performing Mr. Gonzalez's spinal surgery. However, the EOB then states that the "Amount Allowed" by United was just $2,658.62. United calculated Mr. Gonzalez's coinsurance as $1,063.44, and therefore paid only $1,595.18 in benefits for the services Dr. McCance provided. As a result, as the EOB reflects, Mr. Gonzalez was responsible for paying the entire remaining $52,404.82 of the billed charge.

113.    The Notes in the EOB explained how United determined the Eligible Expense in Mr. Gonzalez's case:

> Member: This service was rendered by an out-of-network provider and processed using your out-of-network benefits. If you're asked to pay more than the deductible, copay and coinsurance amounts shown, please call Data iSight at 877-859-2166 or visit DataiSight.com. They will work with the provider on your behalf. Provider: This service has been reimbursed using Data iSight, which utilizes cost data (facilities) or paid data (professionals) if available. Please do not bill the patient above the amount of deductible, copay and coinsurance applied to this service. If you have questions contact Data iSight.

114.    Thus, in the EOB, United confirmed that it used Data iSight to set the Eligible Expense for Mr. Gonzalez's surgery. The EOB further confirms that the amount Data iSight recommended was based on what ONET providers were ***paid*** for their services—i.e., what insurance companies, including United, may have set as the Eligible Expenses without regard to what the provider billed.

115.    If United had used FAIR Health Charge Data to set the Eligible Expense for Dr. McCance's services, the amount covered by the Plan would have been much higher. Even at the 75th percentile (i.e., a lower percentile than in the examples cited above, in which United applied

the 80th percentile to determine "competitive fees"), FAIR Health indicates that the Eligible Expense for the surgery should have been $55,499.99—*more* than Dr. McCance even charged.

116.    On information and belief, United charged the Fresenius Plan a "savings fee" calculated as a percentage of $51,341.38—i.e., the difference between Dr. McCance's billed charge ($54,000) and the amount United deemed Eligible based on Data iSight's recommendation ($2,658.62).

117.    If United had used FAIR Health Charge Data instead, United would not have been able to charge the Fresenius Plan a "savings fee" at all, because it would have determined that 100% of Dr. McCance's billed charge was an Eligible Expense under the plan.

118.    On December 20, 2021, Dr. McCance, through counsel, timely submitted an administrative appeal on Mr. Gonzalez's behalf, challenging how United had determined the McCance claim. In his appeal, Dr. McCance objected to United's use of Data iSight to determine the Eligible Expenses and argued that those amounts should be set based on FAIR Health Charge Data instead, which would have resulted in much higher benefit payments.

119.    United denied the appeal by letter dated June 21, 2022 and identifying UHS, Inc. as the "legal entity" that made the determination. In the letter, United stated that "[b]ased on our review, it has been determined that the request for payment was processed correctly." United asserted that the McCance claim "was processed according to the plan provisions" and, therefore, "the original determination remains unchanged and is upheld."

120.    United then confirmed its use of the Data iSight repricing for setting the Eligible Expenses:

> This claim has been reimbursed using Data iSight, which utilizes cost data if available (facilities) or paid data (professionals). The discount shown is your savings and is not included in the amount you owe. You only need to pay your coinsurance, copayment and/or deductible listed on your explanation of benefits. If

your provider bills you any other amount, please call the toll-free number on your health plan ID card. If your provider has questions about your reimbursement amount, they may visit Data iSight or call toll-free at 1-877-859-2166.

121.     This statement not only conflicts with what United said in the EOB—that Mr. Gonzalez's payment responsibility was $52,404.82 for Dr. McCance's services—it was false and misleading in any event. Dr. McCance never agreed to any "discount," meaning that United had secured no "savings" or "discounts" of any kind. United's assertion that such a discount represented a "savings" for Mr. Gonzalez and was "not included in the amount [he] owe[d]" was also false. Similarly, the representation to Mr. Gonzalez that "[y]ou only need to pay your co-insurance, co-payment and/or deductible listed on your explanation of benefits" was also false, since, under the terms of the Fresenius Plan, he was, and is, responsible for the entire difference between the billed charge and the benefits determined by United. As of the date of this filing, Mr. Gonzalez remains responsible for the entire unpaid amount of Dr. McCance's fee, up to the total billed charge.

122.     Mr. Gonzalez, through counsel, filed a second-level administrative appeal on July 25, 2022, reiterating his arguments against United's use of Data iSight in lieu of FAIR Health.

123.     United denied Mr. Gonzalez's second level appeal on September 8, 2022, in a letter that again identified UHS, Inc. as the "legal entity" making the determination. The rationale United gave for this denial was identical to its denial of the first level appeal.

124.     United's September 8, 2022 letter denying Mr. Gonzalez's appeal stated, "Please be advised that you have exhausted all levels of internal appeal with UnitedHealthcare. There are no further appeal steps available with us."

### *The Frelinghuysen Claim*

125.     In the PRA document UHS, Inc. issued on August 27, 2021, United correctly identified the total "Charge" by Dr. Frelinghuysen as $27,500, but stated that the "Amount

Allowed" was only $531.72. After deducting Mr. Gonzalez's coinsurance obligation of $212.69, the amount United paid was just $319.03. As the PRA reflected, Mr. Gonzalez is responsible for paying the entire remainder of $27,180.97 for Dr. Frelinghuysen's services.

126.    The August 27, 2021 PRA included an identical Note to the one appearing in the July 27 EOB, confirming that United again used Data iSight to reprice the claim.

127.    Again, if United had used FAIR Health Charge Data to set the Eligible Expense, 100% of Dr. Frelinghuysen's billed charges would have been deemed eligible and the amount of benefits United caused the plan to pay would have been much higher.

128.    On information and belief, United charged the Fresenius Plan a "savings fee" calculated as a percentage of $26,968.28—i.e., the difference between Dr. Frelinghuysen's billed charge ($27,500) and the amount United deemed Eligible based on Data iSight's recommendation ($531.72).

129.    If United had used FAIR Health Charge Data instead, United would not have been able to charge the Fresenius Plan a "savings fee" at all, because it would have determined that 100% of Dr. Frelinghuysen's billed charge was an Eligible Expense under the plan.

130.    On December 30, 2021, Dr. Frelinghuysen, through counsel, timely submitted an administrative appeal on Mr. Gonzalez's behalf, challenging United's determination of the Felinghuysen claim. In his appeal, Dr. Frelinghuysen objected to United's use of Data iSight to determine the Eligible Expenses and argued that those amounts should be set based on FAIR Health Charge Data instead, which would have resulted in much higher benefit payments.

131.    United denied the appeal by letter dated July 5, 2022 and identifying UHS, Inc. as the "legal entity" that made the determination. The letter stated, "[b]ased on our review, it has been determined that the request for payment was processed correctly."

132.    United then confirmed its use of the Data iSight repricing for setting the Eligible Expenses, stating, "[t]his claim has been reimbursed using Data iSight, which utilizes cost data if available (facilities) or paid data (professionals). The discount shown is your savings and is not included in the amount you owe. You only need to pay your coinsurance, copayment and/or deductible listed on your explanation of benefits . . . ."

133.    This statement not only conflicts with what United said in the EOB—that Mr. Gonzalez's payment responsibility was $27,180.97 for Dr. Frelinghuysen's services—it was false and misleading in any event. Dr. Frelinghuysen never agreed to any "discount," meaning that United had secured no "savings" or "discounts" of any kind. United's assertion that such a discount represented a "savings" for Mr. Gonzalez and was "not included in the amount [he] owe[d]" was also false. Similarly, the representation to Mr. Gonzalez that "[y]ou only need to pay your co-insurance, co-payment and/or deductible listed on your explanation of benefits" was also false, since, under the terms of the Fresenius Plan, he was, and is, responsible for the entire difference between the billed charge and the benefits determined by United. As of the date of this filing, Mr. Gonzalez remains responsible for the entire unpaid amount of Dr. Frelinghuysen's fee, up to the total billed charge.

134.    Dr. Frelinghuysen, through counsel, filed a second-level administrative appeal on Mr. Gonzalez's behalf on August 16, 2022, reiterating his arguments against United's use of Data iSight in lieu of FAIR Health.

135.    On September 16, 2022, UHS, Inc. responded to the second level appeal by stating it would "process" the claim "accordingly," but without providing any other information about whether or how it intended to change its determination. United's letter did not assert that Mr. Gonzalez would have any further administrative appeal rights with respect to the claim.

136.    On September 23, 2022, Mr. Gonzalez received a new EOB for Dr. Frelinghuysen's services. United's response to Mr. Gonzalez's appeal was not to change the allowed amount, which remained at just $531.72. Instead, United decided that Mr. Gonzalez's co-insurance obligation was $106.35, rather than $212.69 as it previously reported. Accordingly, United issued another $106.34 in benefits for Dr. Frelinghuysen's surgical services, still leaving Mr. Gonzalez to foot the rest of the bill.

137.    The September 23, 2022 EOB, like the other EOBs Mr. Gonzalez had received, confirmed that United used Data iSight to calculate the Eligible Expense. The EOB also falsely represented that Mr. Gonzalez "owe[d]" only his coinsurance payment ($106.35) rather than the unpaid portion of Dr. Frelinghuysen's bill, even though Dr. Frelinghuysen did not agree to accept the reduced amount United purported to "allow." In other words, United's latest EOB did not change any of the aspects of United's benefit determination that Dr. Frelinghuysen, on Mr. Gonzalez's behalf, had challenged in the two administrative appeals of the claim determination.

138.    On October 19, 2022, Dr. Frelinghuysen, through counsel, submitted a third administrative appeal, on Mr. Gonzlez's behalf, to challenge United's determination of the Frelinghuysen claim, repeating the same arguments asserted in the first two appeals. Despite having responded to Dr. Frelinghuysen's two prior appeals on Mr. Gonzalez's behalf, submitted by the same counsel, this time, United refused to process the appeal, claiming that Mr. Gonzalez needed to submit another Designated Authorized Representative form in order to be represented by counsel.

139.    Because Mr. Gonzalez submitted, and United processed, two administrative appeals of United's determination of the Frelinghuysen claim, Mr. Gonzalez's administrative appeals as to the Frelinghuysen claim were exhausted.

### C.      Plaintiff Webb

140.     Ms. Webb received surgery on an ischemic infected finger on March 14, 2020 from Dr. Sean Bidic of American Surgical Arts PC ("ASA"), an ONET provider with respect to United. Because Ms. Webb's surgery was provided while she was admitted as an inpatient at a hospital, she did not have the opportunity to choose an in-network surgeon to perform the surgery.

141.     Dr. Bidic billed $16,513.00 for his professional services as Ms. Webb's surgeon, and ASA submitted a claim for that amount to United on Ms. Webb's behalf.

142.     United determined that the surgery was a covered service under the Fresenius Plan.

143.     On October 19, 2020, UHS, Inc. issued an EOB to Ms. Webb, which reported on how United had determined her claim for benefits. The EOB showed that, of the total billed charge, United considered only $2,664.38 to be "allowed," and paid Dr. Bidic just $211.92.

144.     Although United represented in the EOB that the "Total amount" Ms. Webb "owe[d] the provider(s)" was $5,664.10, in fact, under her plan, Ms. Webb was responsible for $16,301.08—i.e., the entire difference between the $211.92 United paid for Dr. Bidic's services and the full billed charge.

145.     United's EOB to Ms. Webb also falsely represented that her plan had negotiated a "discount" of $14,036.70 with her provider "to save [Ms. Webb] money."

146.     In fact, United did not negotiate any discount with Dr. Bidic or ASA, and the provider did not agree to accept only $211.92 (or even $2,664.38) for the surgical services Ms. Webb received.

147.     Instead, United determined the Eligible Expenses for Dr. Bidic's services based on information provided by Data iSight. In the EOB, United stated:

> MEMBER: THIS SERVICE WAS PROVIDED BY AN OUT-OF-NETWORK
> PROVIDER. WE PAID THE PROVIDER ACCORDING TO YOUR BENEFITS
> AND DATA PROVIDED BY DATA ISIGHT. IF YOU'RE ASKED TO PAY

MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE, PLEASE CALL DATA ISIGHT AT 866-835-4022 OR VISIT DATAISIGHT.COM. THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. IF THE PROVIDER DISAGREES WITH DATA ISIGHT, THE PROVIDER MIGHT BILL YOU FOR THE DIFFERENCE BETWEEN THE AMOUNT BILLED AND THE AMOUNT ALLOWED. WE'VE ASKED THEM NOT TO. PLEASE CONTACT US IF THEY DO. PROVIDER: PLEASE DON'T BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE.

148.

149.    On April 12, 2021, ASA, through counsel, timely submitted an administrative appeal on Ms. Webb's behalf, challenging how United had determined her claim for benefits. Among other things, the appeal argued that "[p]ayment of the billed charges was not made in accordance with the Plan."

150.    United did not respond to the April 12, 2021 appeal.

151.    On February 10, 2022, ASA, through counsel, filed a second administrative appeal on Ms. Webb's behalf, again challenging the unreasonably low reimbursement rate determined by United for Dr. Bidic's services.

152.    United denied the appeal by letter dated June 9, 2022, listing UHS, Inc. as the "legal entity" that made the determination. Without quoting plan language (including the Competitive Fee Term), United upheld its benefit decision, asserting that it "processed the claim according to the plan provisions," and therefore, "the original determination remains unchanged and is upheld."

153.    United then confirmed that it was continuing to rely on Data iSight to determine the benefit amount, stating:

> This claim was processed correctly to your plan benefits. This claim has been reimbursed using Data iSight, which utilizes cost data if available (facilities) or paid data (professionals). The discount shown is your savings and is not included in the amount you owe. You only need to pay your co-insurance, co-payment and/or deductible lisTheted on your explanation of benefits. If your provider bills you any other amount, please call the toll-free member phone number on your health plan

ID card. If your provider has questions about their reimbursement amount, they may visit Data iSight.com or call toll-free at 1-977-859-2166.

154.     This statement not only conflicts with the representation United made in the EOB—that Ms. Webb owed $5,664.10—it was false and misleading in any event. Dr. Bidic and ASA never agreed to any "discount," meaning that United had secured no "savings" or "discounts" of any kind. United's assertion that such a discount represented a "savings" for Ms. Webb and was "not included in the amount [she] owe[s]" was also false. Similarly, the representation to Ms. Webb that "[y]ou only need to pay your co-insurance, co-payment and/or deductible listed on your explanation of benefits" is also false, since, under the terms of the Fresenius Plan, she was, and is, responsible for the entire difference between the billed charge and the Eligible Expenses determined by United. As of the date of this filing, Ms. Webb remains responsible for the entire unpaid amount of Dr. Bidic's fee, up to the total billed charge.

155.     On August 29, 2022, ASA, through counsel, submitted a second level administrative appeal on Ms. Webb's behalf. Among other things, this appeal argued that "[b]y using Data iSight to establish the reimbursement amount based on Data iSight's own internal cost database, the plan has not reimbursed this claim in accordance with Federal law as the plan reimburses out-of-network providers at an amount based on available data resources of competitive fees in the geographic area." The appeal letter further argued that "UHC interprets this language to mean the 80th percentile of FAIR Health charge data."

156.     On October 7, 2022, United sent a letter to Ms. Webb stating that her claim would be reprocessed and that she would have "full appeal rights" with respect to the "corrected" claim determination. United's letter did not state what, exactly, United had decided to "correct" about the way it had determined the claim.

157.    On October 10, 2022, UHS, Inc. issued a Provider Remittance Advice ("PRA") to ASA. The "amount allowed" by United did not change, but United imposed new cost-sharing obligations on Ms. Webb, so that her "patient responsibility" increased nearly $800.00 to $6,463.41—thus shifting even more of the expense onto Ms. Webb and *reducing* the amount of benefits United paid for the claim to just $1,865.07.

158.    The October 2022 PRA again stated at the claim had been determined using Data iSight, repeating the same statement to the "Member" United had included in its October 19, 2020 PRA.

159.    If United had, instead, based its determination on FAIR Health Charge Data (at the 80th percentile, as in the examples cited above), the Eligible Expense for Ms. Webb's surgery would have been $5,839.38, more than three times the amount United determined.

160.    On November 28, 2022, ASA, through counsel, filed yet another administrative appeal on Ms. Webb's behalf. Among other things, this appeal letter objected to United's use of Data iSight as its basis for setting the Eligible Expenses, pointing out that "[t]here is nothing in the member's plan that authorizes reimbursement amounts to out-of-network providers to be determined through this methodology," adding:

> Data iSight is merely a computer database owned by MultiPlan that bases reimbursement on allowed amounts by payors and could not consider what the 'typical competitive charges' are in a given location based on its database. The member's plan requires reimbursement to an out-of-network provider to be based on available data resources of competitive fees in the geographic market. . . .Thus, using Data iSight to establish the reimbursement rate for an out-of-network provider when a plan contains this fee schedule violates the terms of the plan. . . . The plan has violated fiduciary duties in administering benefits under the plan. Finally, use of Data iSight to exclusively price this claim is not in accordance with the benefit plan and benefits have not been paid in accordance with the plan.

161.    The appeal further argued that United should have used FAIR Health Charge Data to determine Ms. Webb's claim because "United Healthcare has stated that when a plan reimburses

an out-of-network provider 'based on available data resources of competitive fees,' it utilizes the 80th percentile of FAIR Health charge data."

162.    United denied Ms. Webb's appeal on January 6, 2023, in a letter identifying UHS Inc.as the "legal entity" that made the determination. Once again failing to acknowledge the Competitive Fee Term in the Fresenius SPD, and ignoring FAIR Health entirely, United reiterated its reliance on Data iSight, repeating the false and misleading paragraph about Data iSight it had included in its June 9, 2022 denial letter.

163.    United's January 6, 2023 letter to Ms. Webb stated, "Please be advised that you have exhausted all levels of internal appeals with UnitedHealthcare. There are no further appeal steps available with us."

## CLASS ALLEGATIONS

164.    United administers numerous Competitive Fee Plans with written plan language that is materially indistinguishable from the Fresenius and Morgan Stanley Plans, as alleged herein.

165.    United frequently processes ONET benefit claims under Competitive Fee Plans without using FAIR Health Charge Data or any other available source of competitive fees to determine the Eligible Expenses. Instead, United uses Repricers, such as Data iSight, to set the Eligible Expenses at far lower rates, so as to justify United to charge substantially higher "savings fees" to the self-funded plans.

166.    There was nothing unique about the way United adjudicated Plaintiffs' claims. Instead, United has engaged in similar misconduct with respect to numerous ERISA plan participants and beneficiaries who received their health benefits through Competitive Fee Plans.

167.    As a result, Plaintiffs bring claims on behalf of a class (the "Class") defined as follows:

All participants and beneficiaries of a Competitive Fee Plan, whose claim for benefits for ONET services was administered by United and United determined that benefits were due and owing under the plan, but where United set the Eligible Expense for the services using data provided by a third-party Repricer instead of using available data resources of competitive fees.

For purposes of this Class Definition, the term "Competitive Fee Plan" means a self-funded employer-sponsored health benefit plan, governed by ERISA and administered by United, that contains a written plan term providing, in substance, that absent an agreement between United and the ONET provider, the Eligible Expenses for ONET services will be "determined based on available data resources of competitive fees in [the] geographic area" in which the service is provided.

168.    The members of this proposed Class are so numerous as to make joinder of all members impractical. Although the precise number of United insured impacted by United's conduct is known only to United and can be obtained only during discovery, United is one of the largest insurance companies in the United States and administers claims on behalf of millions of insureds. Given that the two Plans applicable to the four Named Plaintiffs were issued through two very large private employers (Morgan Stanley, with approximately 60,000 employees, and Fresenius, with over 300,000 employees), it is reasonable to assume that there are many thousands of ERISA insureds who fall within the proposed Class.

169.    There are questions of law or fact common to the Class, including but not limited to: whether United acted as a fiduciary when it engaged in the alleged misconduct; whether, when United determined Eligible Expenses for the Class Members' benefits claims, United violated the plans' Competitive Fee Term by basing Eligible Expenses on Repricer data rather than available data resources of competitive fees; and whether and to what extent United itself benefited from interpreting the plan terms in that manner.

170.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, are committed to the vigorous prosecution of this action, have retained counsel competent

and experienced in class action litigation and the prosecution of ERISA claims, and have no interests antagonistic to or in conflict with those of the Class.

171.    United has acted on grounds that apply generally to the Class, as United has engaged in a uniform practice of reducing benefit payments below the level required by written terms of the Competitive Fee Plans by ignoring the readily-available FAIR Health Charge Data and relying on alternative "relative value scale" methodologies that are designed to reduce reimbursement rates for ONET services and increase its own compensation.

172.    In its role as the Claims Administrator and ERISA fiduciary for the plans at issue, United maintains records of when and how it receives, processes, pays, or refuses to pay claims for ONET services. Pursuant to these records, United will be able to determine for all class members when it used FAIR Health Charge Data to set the Allowed Amount and when it used a different methodology that led to a reduced Allowed Amount. Accordingly, the members of the Class can be readily and objectively ascertained through use of United's records.

## COUNT I

### (Wrongful Denial of Benefits)

173.    The allegations in paragraphs 1 - 172 are re-alleged and incorporated by reference as if fully set forth herein.

174.    Plaintiffs bring this Count, individually and on behalf of all similarly-situated individuals, to recover benefits due under the terms of their plans, to enforce their rights under the terms of their plans, and to clarify their rights to future benefits under the terms of their plans, pursuant to 29 U.S.C. § 1132(a)(1)(B), or, in the alternative, to obtain injunctive or other appropriate equitable relief for Defendants' ERISA and plan violations pursuant to 29 U.S.C. § 1132(a)(3).

175.    The terms of the Plaintiffs' and Class Members' plans called for United to pay benefits for covered health services from ONET providers at rates that were based on "available data resources of competitive fees" in the provider's geographic area. United did not do so. Instead, even though it was aware of a readily-available and reliable source of data on competitive fees, United determined the benefits due for the ONET services received by the Plaintiffs and Class Members at substantially lower rates supplied by United's "Repricer" partners, using a "relative value scale" methodology. As a result, United substantially underpaid the benefits due to Plaintiffs and the Class Members under the terms of their plans.

176.    United's benefit determinations in the Plaintiffs' and Class Members' cases, moreover, turned on United's unreasonable interpretation of, or its decision to outright ignore, the plans' Competitive Fee Term, making its benefit determinations arbitrary and capricious and an abuse of its discretion.

177.    Even if United's interpretation of the Competitive Fee Term was not unreasonable on its face (which it was), its benefit determinations in Plaintiffs' and the Class Members' cases were nevertheless arbitrary and capricious because United interpreted the Competitive Fee Term inconsistently. *Sometimes* United interpreted the Competitive Fee Term as referring specifically to the 80th percentile of Fair Health Charge Data for the provider's region. But *other times*—as in the Plaintiffs' and Class members' cases—United interpreted the very same Competitive Fee Term as referring to substantially-discounted Repricer data.

178.    United's use of Repricer data and methodologies injured Plaintiffs and the Class Members because it reduced the Eligible Expenses for Plaintiffs' and the Class Members' benefit claims well below "competitive fees" and artificially reduced the amount of benefits due for the otherwise-covered services.

179.    United's benefit determinations violated the terms of the Plaintiffs' and Class Members' plans and, as a result, United wrongfully denied benefits due to Plaintiffs and the Class Members.

## COUNT II

### (Claim for Breaches of Fiduciary Duty that Injured Plaintiffs)

180.    The allegations in paragraphs 1 - 172 are re-alleged and incorporated by reference as if fully set forth herein.

181.    Plaintiffs bring this Count, individually and on behalf of all similarly-situated individuals, to obtain injunctive or other appropriate equitable relief for Defendants' breaches of their ERISA fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3), or, in the alternative, to clarify and enforce their rights under the terms of their plans, pursuant to 29 U.S.C. § 1132(a)(1)(B).

182.    As alleged above, each Defendant is a fiduciary with respect to Plaintiffs' and the Class Members' plans and possessed and exercised discretionary authority with respect to the benefit determinations at issue herein.

183.    United's self-serving savings-fee scheme, and its decision in service of that scheme to ignore the Competitive Fee Term and use Repricer data instead, breached its ERISA fiduciary duties to the Plaintiffs and the Class Members.

184.    First, ERISA's duty of loyalty requires fiduciaries to discharge their duties with respect to a plan "solely in the interests of the participants and beneficiaries of the plan," and for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." United breached its duty of loyalty because its decision to use Repricer data to set the Eligible Expense for Plaintiffs' and Class Members' covered ONET services was driven by United's own financial interest in concocting a justification for charging the plans larger "savings fees," by making it appear as though United

had obtained substantial discounts for the plan members. In reality, United merely refused to pay the ONET providers' full billed charge and unilaterally set the Eligible Expense well below competitive fees for the services, without obtaining any agreement from the providers to accept a discounted amount. The "savings" United claimed were thus illusory, because the Plaintiffs and Class Members remain financially and legally liable for the unpaid portions of their providers' bills. As such, United's self-serving scheme was directly contrary to the Plaintiffs' and Class Members' interests and breached its duty of loyalty.

185.  Second, United's self-interested practices also violated its fiduciary duty to act in accordance with the written terms of the Competitive Fee Plans, since it uses Repricer data to avoid setting Eligible Expenses based on readily-available data on competitive fees, and instead to set Eligible Expenses based on methodologies that take deep discounts off of those fees—directly contrary to the plan terms.

186.  Third, United's inconsistent approach to the Competitive Fee Term—sometimes following it, and other times ignoring it—violated its fiduciary duty of care and prudence. Among other things, United's inconsistent practice failed to comply with the ERISA regulations that required United "to ensure and to verify" that similarly-situated claims would be determined consistently.

187.  United's breaches of fiduciary duty injured the Plaintiffs and the Class Members because United manipulated the Eligible Expense and deliberately reduced the amount of benefits they would receive for their covered health services so that it could misdirect a portion of those benefits to its own coffers in the form of a wholly-unearned "savings fee." In so doing, moreover, United left Plaintiffs and the Class Members responsible to pay the remainder of their providers'

billed charges and undercounted the amount of their out-of-pocket payments that would count toward their cost-sharing obligations.

## COUNT III

### (Claim for Breaches of Fiduciary Duty that Injured Plaintiffs' Plans)

188.   The allegations in paragraphs 1 – 172 are re-alleged and incorporated by reference as if fully set forth herein.

189.   Plaintiffs bring this Count, individually and on behalf of all similarly-situated individuals, pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a).

190.   As alleged above, each Defendant is a fiduciary with respect to Plaintiffs' and the Class Members' plans.

191.   United's "savings fee" scheme and its deliberate use of Repricer data instead of FAIR Health Charge Data or another available data resource of competitive fees, in order to drive larger "savings fees," breached United's fiduciary duties of care, loyalty, and adherence to plan terms as explained above.

192.   United's breaches caused losses to the plans, because United charged the plans inflated "savings fees" for "savings" that were illusory in the first place, causing plan assets to be misdirected away from their "exclusive purpose" of paying benefits and legitimate administrative expenses, and instead sent them straight into United's pockets.

193.   ERISA also prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D), and from "dealing with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1). United's "savings fee" scheme violated these prohibitions, because United knew or should know that the "savings fees" it charged to the plans effectively

transferred plan assets to United and the Repricers, rather than those assets being used to pay benefits as required by the plan terms. And of course, United, a "party in interest" with respect to the plans, designed the entire "savings fee" scheme to serve its own interests, at the plans' and plan participants' expense.

## COUNT IV

### (Co-Fiduciary Liability)

194.    The allegations in paragraphs 1 - 172 are re-alleged and incorporated by reference as if fully set forth herein.

195.    Plaintiffs bring this Count, individually and on behalf of all similarly-situated individuals, pursuant to 29 U.S.C. §§ 1132(a)(1)(B), (a)(2) & (a)(3) and 29 U.S.C. § 1105(a).

196.    Each Defendant is a fiduciary with respect to Plaintiffs' and the Class Members' plans and the benefit determinations at issue herein.

197.    As set forth above, each Defendant participated knowingly in and knowingly undertook to conceal the fiduciary breaches described herein; failed to comply with 29 U.S.C. § 1104 and thereby enabled its co-fiduciaries to commit breaches of fiduciary duty; and/or had knowledge of the fiduciary breaches alleged herein and failed to make reasonable efforts to remedy the breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against United as follows, in such combination as the Court deems most appropriate to fully and adequately remedy United's misconduct as alleged above:

A.    Certifying the Class and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    Declaring that United violated its legal obligations in the manner alleged above;

C.      Permanently enjoining United from engaging in the misconduct alleged above;

D.      Awarding Plaintiffs and the Class Members benefits due, plus pre- and post-judgment interest; or ordering United to re-adjudicate the benefit amounts due for Plaintiffs and the Class Members' claims and to cause the full amount of benefits owed to be paid, plus pre- and post-judgment interest;

E.      Ordering United to disgorge any amounts by which it was unjustly enriched through the ERISA and plan violations detailed above, to issue restitution for the losses suffered by Plaintiffs and the Class Members as a result of such misconduct, to order payment of an appropriate surcharge, and/or other appropriate equitable relief;

F.      Ordering United to make good to Plaintiffs' and the Class Members' plans any losses the plan sustained as a result of United's fiduciary breaches as described above, and to restore to each such plan any profits United made through use of the plan's assets, and/or other appropriate equitable relief; and

G.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable attorney fees, in amounts to be determined by the Court; and

H.      Granting such other and further equitable or remedial relief as is just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.


Dated: April 14, 2022                        By:    /s/ D. Brian Hufford

                                             D. Brian Hufford, Esq.
                                             Jason S. Cowart, Esq.
                                             **ZUCKERMAN SPAEDER LLP**
                                             485 Madison Avenue, 10th Floor
                                             New York, NY 10022
                                             Tel. (212) 704-9600
                                             dbhufford@zuckerman.com
                                             jcowart@zuckerman.com

Caroline E. Reynolds, Esq. (*pro hac vice*)
Trillium Chang, Esq. (*pro hac vice*)
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel. (202) 778-1800
creynolds@zuckerman.com
tchang@zuckerman.com

Leslie Howard, Esq. (*pro hac vice*)
**COHEN HOWARD, LLP**
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
Tel. (732) 747-5202
lhoward@cohenhoward.com

*Counsel for Plaintiffs*